Eric SILBERBERG, Plaintiff,

v.

Richard LYNBERG, Jill Defelice, Paul Locicero, Town of Derby, Town of Ansonia, Town of Shelton, Town of Seymour, Town of Woodbridge, and Town of Monroe, Defendants.

No. Civ. 3:99CV02249AWT.

United States District Court, D. Connecticut.

Feb. 20, 2002.

W. Martyn Philpot, Jr., Marc L. Glenn, Law Offices of W. Martyn Philpot, Jr., LLC, New Haven, CT, for plaintiff.

Richard J. Buturla, Warren L. Holcomb, Brian W. Smith, Berchem, Moses & Delvin, P.C., Milford, CT, Stephen P. Fogerty, Robert Avery Rhodes, Halloran & Sage, Westport, CT, James Newhall Tallberg, Updike, Kelly & Spellacy, P.C., Hartford, CT, Thomas J. Welch, Winnick, Vine, Welch, Donnelly & Teodosio, Shelton, ST, Kevin Michael Blake, Shepro & Blake, Stratford, CT, Robert Nastri, Jr., Tinley, Nastri, Renehan & Dost, Waterbury, CT, Thomas R. Gerarde, Lisa K. Titus, Beatrice S. Jordan, Howd & Ludorf, Hartford, CT, for defendants.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

THOMPSON, District Judge.

The plaintiff, Eric Silberberg ("Silberberg") brings this action against three individuals and six towns involved with the Valley Street Crime Unit ("VSCU"), a cooperative law enforcement operation in the Naugatuck Valley area of the State of Connecticut, in four counts: (1) deprivation of civil rights in violation of 42 U.S.C. § 1983; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; and (4) malicious prosecution, against the individual defendants only. Each of the defendants has moved for summary judgment on and/or dismissal of all counts of the complaint setting forth claims against him, her or it. For the reasons set forth below, the motions for summary judgment are being granted as to the first three counts and as to defendant Lynberg on Count Four, and Count Four is being dismissed without prejudice as to defendants Locicero and DeFelice.

## I. *FACTUAL BACKGROUND*

The plaintiff is an African–American man. The VSCU is a law enforcement body created by an interlocal agreement among municipalities in the Naugatuck Valley area, and involving personnel from each of the member municipalities and from the Connecticut State Police. At the times relevant to this case, the towns participating in the VSCU were Derby, Ansonia, Shelton, Seymour, Woodbridge and Monroe.[1]

On August 1, 1996, Detective Paul Locicero ("Locicero"), Detective Jill DeFelice ("DeFelice") and other officers assigned to the VSCU were involved in an undercover investigation of drug activity in an area of Ansonia, Connecticut known as Gatison Park. Locicero was an officer of the Ansonia Police Department assigned to the VSCU, and DeFelice was an officer of the Seymour Police Department assigned to the VSCU. Gatison Park is an area known by the police, including the VSCU, to be frequented by sellers and users of illegal drugs. Locicero and others were in an

---

1. The VSCU was dismissed as a defendant to this case on November 27, 2001. See Doc. # 97. However, the towns which were members of the VSCU remain defendants as the "real parties in interest" behind the interlocal agreement.

observation van, while DeFelice was alone in an unmarked vehicle. When the officers in the van arrived at Gatison Park, they saw a man sitting on a park bench wearing a green shirt and dungarees. Locicero claims that he recognized the man as Eric Silberberg, the plaintiff.

Prior to August 1, 1996, Locicero was familiar with Silberberg, and had heard from other police officers that Silberberg sold drugs. Locicero had personally seen Silberberg on a number of occasions, and had observed him engaging in what he considered "suspicious" activities, Locicero Dep. at 69, but had never seen Silberberg engage in a hand-to-hand sale of illegal drugs. Similarly, DeFelice had seen Silberberg on at least three or four occasions prior to August 1, 1996, and she had heard that he was involved in drug activity but had never seen him make a drug sale. At trial, DeFelice testified that she "did not know [Silberberg] personally" prior to August 1, 1996. Doc. # 106, Ex. 3 at 32. Silberberg admits to having sold crack in the Gatison Park area at one time, but contends that he stopped doing so in 1995.

Upon seeing the man in the park, Locicero radioed to DeFelice that Eric Silberberg, who he knew to be a drug dealer, was sitting on the bench. He indicated that the man he identified as Silberberg was a light-skinned black male wearing a green shirt and dungarees, and told DeFelice to approach him. DeFelice drove up to the park in her unmarked vehicle, and saw only one person in the park, a man who fit the description she had been given. DeFelice was wearing a one-way radio which permitted the other VSCU officers, including Locicero, to hear what she said and what others in close proximity said to her.

DeFelice pulled up to the edge of the park and looked at the man. The man approached her vehicle and said "What's up?" DeFelice said "I want one", referring to one package of crack cocaine, to which the man responded: "I only have 20s, and you have to get out of your car." The man then turned around and walked back towards the bench where he had been sitting when DeFelice arrived. At about 6:40 p.m., DeFelice got out of her car and followed the man to the bench, where she gave him twenty dollars and he gave her a substance which was later determined to be crack cocaine. During this transaction, Locicero was near the park in the surveillance van, approximately 40–70 feet away from the park bench at which the transaction took place. Locicero saw the man he identified as Silberberg approach DeFelice in her car, and saw that he was the only man in the park. Locicero did not, however, actually witness the sale of drugs by the man to DeFelice because DeFelice was out of his line of sight once she followed the man into the park.

After purchasing the drugs, DeFelice got back into her car and left the area to meet with the other VSCU officers working on the undercover assignment. DeFelice turned the drugs over to Locicero. The officers decided that DeFelice should go back to make another purchase from the same man.[2] At about 6:50 p.m., DeFelice drove back to the park, and pulled into a parking lot behind an abandoned building near the park. The man who had sold her the drugs approached DeFelice in the car and sold her another twenty dollars worth of crack cocaine. At that point, DeFelice started to drive out of the parking lot, but stopped and pulled back up to the man just a few seconds later. The

---

**2.** The State's Attorney who worked with the VSCU had advised the officers that they should get any individual targeted by their investigations to make at least three drug sales before arresting him.

man again approached the car and asked DeFelice if something was wrong. She said no, and asked for "another one". The man sold her another twenty dollars worth of crack cocaine.

On or about September 24, 1996 and October 21, 1996, Locicero prepared affidavits in support of an arrest warrant identifying Eric Silberberg as the man who sold crack cocaine to DeFelice on August 1, 1996.[3] An arrest warrant was issued for Silberberg sometime after the second application was submitted. In or about February 1997, Silberberg, who was on probation for a prior conviction (which was not drug related) checked in with his probation officer and was informed that he had two outstanding warrants from the VSCU. Silberberg contacted Locicero and asked about the warrants; Locicero told Silberberg that he should turn himself in. At that time, Silberberg said: "Why? I don't live over there. I live in New Haven.... I didn't do it." Doc. # 106, Ex. 2 at 27. Silberberg turned himself in to the VSCU on or about February 18, 1997 and was arrested on the two warrants issued as a result of the events on August 1, 1996. Silberberg was released after his arrest on a promise to appear; no bond was required. Silberberg claims that Locicero arranged for him to be released on only a promise to appear in order to persuade Silberberg to cooperate with the VSCU in an undercover investigation. Locicero denies any involvement in the decision to release Silberberg on a promise to appear, and claims that he did not meet with Silberberg at all until after he had been released on the promise to appear.

After Silberberg was released, Locicero contacted him and asked him to cooperate with the VSCU in an undercover operation targeting a man named Randy Redd, who the VSCU believed to be a major drug dealer in Ansonia, particularly in the Gatison Park area. Silberberg had at one point worked for Randy Redd as a drug dealer, but Silberberg claims that he severed all ties with Redd sometime in 1995. Silberberg told Locicero that he felt he had to cooperate, even though he was not guilty of the charges; Silberberg agreed to cooperate.

Locicero wanted Silberberg to help the VSCU get evidence that would lead to the arrest of Randy Redd. To this end, Locicero directed Silberberg to purchase crack cocaine on several occasions from drug dealers whom he believed to be working for Randy Redd. Locicero hoped that these lower-level drug dealers would in turn cooperate in an undercover operation targeting Randy Redd, eventually allowing the VSCU to arrest Redd himself. On each occasion, Locicero provided Silberberg with cash, which Silberberg used to purchase crack cocaine. Silberberg then delivered the crack to Locicero. The dealers from whom Silberberg purchased crack as part of this operation were later arrested.

Silberberg contends that throughout the period of his cooperation, Locicero continually threatened him with the prospect of a longer sentence for the drug charges if he did not cooperate fully, but promised him that the charges would be dropped if he helped them get Randy Redd. In or about early September 1998, Silberberg refused

---

**3.** The first application Locicero prepared requested three arrest warrants, one for each sale of crack cocaine that was made to DeFelice on August 1, 1996. Upon reviewing the application, the State's Attorney advised Locicero to apply for only two warrants, one charging Silberberg with one count, based upon the 6:40 p.m. sale, and one charging Silberberg with two counts, treating the second and third sales as a single transaction because they occurred so close together in time. Thus, Locicero was required to prepare a second application.

to cooperate further. Locicero referred the case to the State's Attorney for prosecution.

In September 1998, after he stopped cooperating with the VSCU, Silberberg claimed that he had an alibi for August 1, 1996. Locicero has supplied an affidavit stating that this was the first time Silberberg had claimed he had such an alibi. Silberberg's memorandum in opposition to the motions for summary judgment states that "Locicero had knowledge of Silberberg's alibi for August 1, 1996 throughout the course of his cooperation", Pl.'s Memo. in Opp. at 13, but the plaintiff has not provided any evidence in support of this contention.[4]

Silberberg claimed that from 9:00 a.m. until 6:00 p.m. on August 1, 1996 he was selling hotdogs at the green in downtown New Haven. In support of this alibi, Silberberg produced a witness, Tim Washington, who ran the hotdog vending company which supplied the cart Silberberg claimed to have been running on August 1, 1996. Washington is Silberberg's uncle.

Washington stated that Silberberg was working with him on August 1, 1996, in New Haven. He produced handwritten work records which showed Silberberg as having worked that day. The record was a report of the sales made on August 1, 1996; the report had Silberberg's name on it, in his own hand, and next to his name the handwritten date "8-1-96". There was no other date on the report which would indicate when it had been prepared. Locicero did not find Washington's evidence to be credible. Locicero still believes that it was Silberberg he saw in Gatison Park

on August 1, 1996, and who sold the crack cocaine to DeFelice that day.

Silberberg was tried before a jury in state court in October 1998 on three counts of selling crack cocaine. Washington testified at trial that Silberberg was with him in New Haven on August 1, 1996, and produced the work records as evidence at trial. Locicero, DeFelice, and Silberberg also testified at the trial. On October 6, 1998, the jury returned a verdict of not guilty on all charges. The plaintiff filed his complaint in this case on November 17, 1999.

## II. *LEGAL STANDARD*

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223 (2d Cir.1994). Rule 56(c) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202

---

4. At oral argument, plaintiff's counsel stated that Silberberg's affidavit and/or Silberberg's testimony at his criminal trial corroborated his allegation that he had informed Locicero of his alibi at the time of his arrest, or shortly thereafter. However, Silberberg's affidavit makes no reference to this issue. See Doc. # 106. Likewise, Silberberg's testimony at his criminal trial, while it goes into some detail about the alibi itself, makes no reference to when he informed Locicero or anyone else of the alibi.

(1986); *Donahue v. Windsor Locks Board of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir. 1987); *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine *and* related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. As the Court observed in *Anderson:* "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* at 248, 106 S.Ct. 2505. Thus, only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Del. & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trs. of Columbia Univ.,* 131 F.3d 305, 315 (2d Cir.1997) (quoting *W. World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," *Weinstock,* 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, ... [and] must come forward with specific facts showing that there is a genuine issue for

trial." *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993) (quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." *Weinstock*, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted. The question then becomes whether there is sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party. *See Anderson*, 477 U.S. at 248, 251, 106 S.Ct. 2505.

### III. *DISCUSSION*

The defendants have moved for summary judgment on all four counts in the complaint, or, if summary judgment is granted in their favor on Count One, for dismissal of the remaining state law claims.[5] The court confirmed at oral argument that the plaintiff is pursuing the following claims: Count One, 42 U.S.C. § 1983 claims based on equal protection, malicious prosecution and false arrest; Count Two, intentional infliction of emotional distress; Count Three, negligent infliction of emotional distress; and Count Four, common law malicious prosecution.

### A. *Defendant Richard Lynberg*

■ The complaint makes the following allegations regarding defendant Richard Lynberg ("Lynberg"):[6]

During all times mentioned in this complaint the co-defendant, Richard Lynberg, was the Lieutenant Commander of the defendant Valley Crime Unit and as such was responsible for the daily operations of said unit and was acting within

his official capacity and under color of law. Co-defendant Lynberg, who is white in color and Caucasian of race[,] is sued in his official and individual capacities.

Compl. ¶ 14. However, Lynberg has submitted an affidavit stating that he was not involved with the VSCU at the time of the August 1996 operation or at the time of the arrest of the plaintiff. See Doc. # 60, Ex. C. Lynberg's affidavit states that he was commander of the VSCU from on or about March 12, 1998 to March 4, 1999. Lynberg Aff. ¶ 4. The plaintiff has offered no evidence showing that Lynberg's affidavit is inaccurate, or that Lynberg was personally involved in any way with the investigation, arrest or prosecution of Silberberg. Such personal involvement is required to state a claim:

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indif-

---

5. There are nine defendants in this case, who among them filed eight motions for summary judgment. Each of those motions makes different arguments in support of summary judgment. However, the plaintiff chose to respond to the motions in a single, consolidated brief, and has had the opportunity to address all arguments raised by all defendants. The

court will therefore treat the arguments in each motion as though they had been made on behalf of all defendants to whom they could be applicable.

6. The defendant spells his name "Richard Lindberg" on his affidavit. See Doc. # 60, Ex. C.

ference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (internal quotation marks and citations omitted). *See also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). The plaintiff has failed to provide any evidence which would permit a finding that Lynberg is liable under 42 U.S.C. § 1983 for the actions complained of by the plaintiff. Summary judgment will therefore be entered in favor of defendant Richard Lynberg as to all claims in Count One.

■ Summary judgment in favor of Lynberg is also appropriate on the state law claims set forth in Counts Two, Three and Four. Lynberg was not a member of the VSCU in 1996, when the plaintiff was investigated, nor in 1997, when the plaintiff was arrested. The plaintiff has not pointed to any evidence that Lynberg was personally involved in his case in any way. Thus, there is no evidence to support the claims of intentional and negligent infliction of emotional distress, and common law malicious prosecution, as against this defendant. Further, counsel for the plaintiff conceded at oral argument that the plaintiff had been mistaken as to who was the supervisory officer of the VSCU at the time of the incidents in this case, and that in light of the fact that Lynberg had not in fact been the supervisor at the time of Silberberg's investigation and arrest, the plaintiff had no argument as to why Lynberg should remain a defendant in this case. The court finds that summary judgment in favor of defendant Richard Lynberg is therefore appropriate as to Counts One, Two, Three and Four.

**B. *Statute of Limitations***

The defendants argue that the plaintiff's claims are barred by the applicable statute of limitations. The limitations period applied to actions brought in Connecticut pursuant to 42 U.S.C. § 1983 is three years. *See* Conn.Gen.Stat. § 52–577; *Lounsbury v. Jeffries,* 25 F.3d 131 (2d Cir.1994).[7] The plaintiff's state law tort claims are also governed by this statute. The complaint in this case was filed on November 17, 1999. Thus, any cause of action arising out of events occurring prior to November 17, 1996 would be time-barred. The defendants contend that because the incident reports regarding the events of August 1, 1996, as well as the applications for the arrest warrants eventually issued for Silberberg, were prepared in August, September, and October 1996, the plaintiff's claims are barred.

■ "Connecticut courts, however, have recognized that where there is a continuing course of conduct constituting a breach of duty, the limitations period does not begin to run, or is tolled, until that conduct terminates." *City of West Haven v. Commercial Union Ins. Co.,* 894 F.2d 540, 545 (2d Cir.1990). The Connecticut Appellate Court has recently addressed this issue.

A party states a claim that falls under the continuing course of conduct doctrine if he or she demonstrates evidence of a breach of a duty that existed "after commission of the original wrong related thereto." In other words, the party alleging a claim under that doctrine must prove that, after an initial wrong, the wrongdoer breached a duty that continued to exist. Additionally, a party must demonstrate that such breach occurred within the statute of limitations. Parties

---

7. The court notes that in at least one instance, see Doc. # 58 at 18, the defendants have erroneously claimed that the governing statute is Conn.Gen.Stat. § 52–584. The opinion in *Lounsbury* explicitly states that § 52–577 applies to actions brought pursuant to 42 U.S.C. § 1983.

are customarily able to avail themselves of that doctrine if they can demonstrate either that there was a special relationship between the parties giving rise to a continuing duty or later wrongful conduct of a defendant that was related to the prior act. Determining whether a continuing duty exists is a question of law.

*Nieves v. Cirmo,* 67 Conn.App. 576, 787 A.2d 650, 654 (2002) (internal quotation marks and citations omitted).

■ Here, the plaintiff has alleged a continuing course of conduct on the part of the defendants that begins with the events of August 1, 1996 and continues through October 1998. The plaintiff does contend that the defendants made false statements in the incident reports prepared in August 1996, and in the applications for arrest warrants prepared in September and October 1996. However, he also contends that his arrest in February 1997 was unlawful, and that throughout the entire period of his cooperation, from February 1997 through September 1998, the defendants pursued the charges against him even though he asserted his innocence, and even though they knew they did not have probable cause to prosecute him. The plaintiff further alleges that defendants Locicero and DeFelice, as well as another member of the VSCU who has not been named as a defendant, testified falsely at his criminal trial in October 1998.

It is true that the plaintiff could have brought his claims for intentional and negligent infliction of emotional distress, as well as his 42 U.S.C. § 1983 claim for false arrest and equal protection, at any time after his arrest in February 1997. It is also true that the plaintiff could have brought his claim for malicious prosecution immediately after his acquittal in October 1998. If the plaintiff had done so, there would be no question that his claim was not barred by the statute of limitations. However, the mere fact that the plaintiff could have filed his suit earlier does not mean that his failure to do so results in his claim being time barred.

The court finds that the plaintiff has sufficiently alleged a continuing course of conduct by the defendants which began in August 1996 and did not end until October 1998, and that his claims, filed in 1999, are therefore timely. Summary judgment is therefore not appropriate on this basis.

### C. *Count One: 42 U.S.C. § 1983*

■ "To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). The plaintiff asserts that the defendants violated his constitutional rights in three distinct ways. First, the plaintiff claims that his Fourteenth Amendment right to equal protection right was violated, specifically that he was treated differently because of his race and color. Second, the plaintiff claims that his Fourth Amendment rights were violated because he was arrested without probable cause. Third, the plaintiff claims that his Fourth Amendment rights were also violated because he was subjected to malicious prosecution.[8] Locicero and DeFelice were each acting in

---

8. The complaint also states that the defendants subjected the plaintiff to "denial of due process of law". Compl. ¶ 26. However, aside from this phrase, there are no allegations or statements in the complaint, or in the plaintiff's opposition to the motions for sum- mary judgment, that address a claim of violation of due process. Therefore, the court does not construe the complaint as setting forth a claim for violation of the plaintiff's due process rights.

their capacities as police officers when the plaintiff claims· they violated his rights, and there is no dispute that they were acting under color of law. The applicability of § 1983 to the town defendants will be discussed later.

### 1. Equal Protection

The complaint alleges that the defendants subjected the plaintiff to "denial of equal protection under the law." Compl. ¶ 26. The plaintiff alleges that the VSCU "has a history, pattern and practice of depriving African–Americans of their rights". Compl. ¶ 24. The complaint further alleges that the plaintiff is "African–American of race and black of color", and that each of the individual defendants is white. Compl. ¶¶ 3, 12, 13, 14. The complaint does not make any additional allegations in support of an equal protection claim.

■ In order to state a claim for violation of his right to equal protection under the law, the plaintiff must allege that:

> (1) he, compared with others similarly situated, was selectively treated; and (2) . . . such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Crowley, Jr. v. Courville, et al,* 76 F.3d 47, 52–53 (2d Cir.1996). Both of these elements are necessary to state a claim. *See also A.B.C. Home Furnishings, Inc. v. Town of E. Hampton,* 964 F.Supp. 697, 702 (E.D.N.Y.1997) ("Recent Second Circuit decisions have been careful to apply each prong of the test separately, finding the

failure to satisfy either inquiry fatal to the plaintiff's claim.")

■ "To establish that he was subject to selective treatment, a plaintiff must plead that he was similarly situated to other persons but was nevertheless treated differently." *A.B.C. Home Furnishings, Inc.,* 964 F.Supp. at 702. *See also Gagliardi v. Village of Pawling,* 18 F.3d 188, 193 (2d Cir.1994) (To state a claim for violation of equal protection rights, "it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently."); *Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54, 61 (2d Cir.1985).

■ The complaint does not allege that Silberberg was treated differently than any other similarly situated person. The plaintiff's memorandum in opposition to the defendants' motions for summary judgment claims that a disproportionate number of the persons arrested by the VSCU were African–Americans.[9] Statistical evidence tending to show that a particular group suffered a disparate impact from some government action "is clearly insufficient to support an inference that any of the decision makers in [the plaintiff's] case acted with discriminatory purpose." *McCleskey v. Kemp,* 481 U.S. 279, 297, 107 S.Ct. 1756 (1987). The statistics produced by the plaintiff may or may not establish that a disproportionate number of the persons arrested by the VSCU are black; but the plaintiff has offered no evidence to show that any such situation resulted from an impermissible discriminatory intent. "Absent some evidence of such an intent or purpose, there is no equal protection claim." *Eagleston v. Guido,* 41 F.3d 865, 878 (2d Cir.1994). Silberberg

**9.** The plaintiff contends that 61% of the persons arrested by the VSCU during the period reflected by the records provided (1994 through 2000), see Pl.'s Ex. 11, were African–American, while only 3% of the population of the Naugatuck Valley is African–American. This exhibit actually shows that approximately 57% of arrestees in this period were classified by the VSCU as "black".

has presented no evidence that the VSCU was aware of other people who were not African–American who should have been arrested and prosecuted for drug sales but—because of their race—were not.[10] Nor has he presented any other evidence of any discriminatory intent on the part of any of the defendants.

"Complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987). *See also Koch v. Yunich,* 533 F.2d 80, 85 (2d Cir.1976) ("Complaints relying on the civil rights statutes are plainly insufficient unless they contain some specific allegations of fact indicating a deprivation of civil rights, rather than state simple conclusions.").

The plaintiff has failed to allege how he was treated differently from any similarly situated persons. Count One therefore fails to state a claim for violation of the plaintiff's equal protection rights and each of the defendants is entitled to summary judgment on this claim.

### 2. The Town Defendants[11]

"Municipal liability under § 1983 occurs, if at all, at the level of policymaking, and cannot be premised on a theory of respondeat superior." *Ciraolo v. City of New York,* 216 F.3d 236, 242 (2d Cir.2000). *See also Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983.").

"In order to establish the liability of a municipality in an action under § 1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must show that the violation of his rights resulted from a municipal custom or policy." *Gottlieb v. Cty. of Orange,* 84 F.3d 511, 518 (2d Cir.1996). *See also Bd. of the Cty. Comm'rs of Bryan Cty., Okla. v. Brown,* 520 U.S. 397, 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("[A] 'policy' giving rise to liability cannot be established merely by identifying a policymaker's conduct that is properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.").

Thus, in order to show that the town defendants are liable, the plaintiff must establish that the actions he alleges were unconstitutional were taken (1) by an agent with policymaking authority; (2) pursuant to an official policy; or (3) pursuant to a custom. First, the plaintiff has not alleged that Locicero or DeFelice were policymakers for the VSCU or its member towns. Second, the plaintiff has not pointed to any official policy, ordinance, or reg-

---

**10.** In fact, Silberberg stated at his deposition that he could not recall if there were any drug dealers in the Gatison Park area who were white.

**11.** The court notes that the town defendants can be liable, in cases such as this, as the "real parties in interest" behind the VSCU. *See* Conn.Gen.Stat. § 7–339k. As the court indicated when it dismissed the VSCU as a party, the formation of an interlocal agree-

ment does not create an independent legal entity capable of being sued. See Doc. # 97. But that does not mean that simply by acting jointly, the towns can escape all liability for their actions. Several of the town defendants have argued that because no officer from that particular town was involved in the arrest or prosecution of Silberberg, the town can not be liable. However, the towns, as the "real parties in interest", may be liable for any unlawful actions taken by the VSCU.

ulation of the VSCU or any of its member towns which condones or encourages the arrest or prosecution of anyone without probable cause. There is no evidence that any such policy exists. Third, the plaintiff has offered no evidence in support of his assertion that the VSCU had a custom of encouraging or allowing the arrest and prosecution of people without probable cause. The complaint alleges that the VSCU "has a history, pattern and practice of depriving African–Americans of their rights" and that the VSCU "maintained and condoned a custom of depriving individuals, such as the plaintiff, of their constitutional rights, through its traditions, policies, ordinances, regulations and decisions officially adopted and promulgated by and through the department." Compl. ¶ 24. The plaintiff has not offered any evidence in support of his theory that the VSCU deprives African–Americans of their rights; as noted above, the mere fact that African–Americans are often arrested by the VSCU does not support an inference that the VSCU is violating their rights. The plaintiff has not offered any evidence in support of his claim that the VSCU has a custom of arresting and prosecuting people without probable cause.

Since the plaintiff has failed to offer any evidence which would support a finding that the town defendants should be liable under 42 U.S.C. § 1983 for the actions taken by defendants Locicero and DeFelice, the town defendants are entitled to summary judgment on the false arrest and malicious prosecution claims in Count One.

**3. The Individual Defendants**

▮▮▮ Defendants Locicero and De-Felice contend that even if they violated the plaintiff's constitutional rights, they are entitled to qualified immunity.[12] The court agrees.

The doctrine of qualified immunity provides immunity to government officials sued in their individual capacity in any of three situations: (1) if the conduct at issue is not prohibited by federal law; (2) even if the conduct was prohibited, if the plaintiff's right was not clearly established at the time of the conduct; or (3) if the defendant's conduct was objectively legally reasonable in light of clearly established law.

*Anobile v. Pelligrino,* 274 F.3d 45, 62–63 (2d Cir.2001). *See also Martinez v. Simonetti,* 202 F.3d 625, 633 (2d Cir.2000).

▮▮▮ "A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). If the court finds that a clearly established right of the plaintiff has been violated, the court must then determine whether the defendant's actions "could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

12. Defendants Locicero and DeFelice were sued in both their individual and official capacities. Qualified immunity is available only to defendants sued in their individual capacities, not official capacities. *See, e.g., Jemmott v. Coughlin,* 85 F.3d 61, 64 n. 1 (2d Cir.1996). When a public employee is sued "in his official capacity", the plaintiff seeks to impose liability on the entity that he represents. *See Brandon v. Holt,* 469 U.S. 464, 471, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). The court has already found that the town defendants are entitled to summary judgment on Count One. Therefore, defendants Locicero and DeFelice, in their official capacities, are also entitled to summary judgment on this count.

■ Silberberg alleges that Locicero and DeFelice violated his constitutional rights to be free from arrest without probable cause and malicious prosecution. These rights had been clearly established for many years when the events in this case took place. *See, e.g., Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). *See also Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir.1995) (rights "to be free from false arrest [and] malicious prosecution" are clearly established). However, Locicero and DeFelice are entitled to qualified immunity as a matter of law if they make a showing that "either (a) it was objectively reasonable for the officer[s] to believe that probable cause existed, or (b) officers of reasonable competency could disagree on whether the probable cause test was met." *Wachtler v. Cty. of Herkimer*, 35 F.3d 77, 80 (2d Cir. 1994) (internal citations and quotation marks omitted). The court finds that there is no genuine issue of material fact as to whether it was objectively reasonable for Locicero and DeFelice to believe that they had probable cause to arrest Silberberg.

Silberberg does not contest that DeFelice bought crack cocaine in Gatison Park on August 1, 1996 from a man matching his description. Silberberg does not contest that at some time not long before August 1, 1996 he himself sold crack cocaine in the Gatison Park area, fraternized with drug dealers at the Park, and worked with or for Randy Redd, nor does he dispute that the police, and Locicero in particular, knew of his involvement in these activities.

The plaintiff claims that Locicero should have accepted his alibi defense and investigated it further. Washington testified at trial that Silberberg was working with him on August 1, 1996, in New Haven. He produced handwritten work records which showed Silberberg as having worked that day. However, Locicero has testified that he did not find this evidence credible, for several reasons. First, Washington was a close relative of Silberberg, and thus may have had a personal interest in securing Silberberg's acquittal. Second, the work records produced were handwritten and not dated in any verifiable way; it would have been easy for Washington to fabricate such records at any time. Third, Silberberg had not offered this alibi evidence at any time prior to September 1998, when his case was ready to go to trial. Although counsel for the plaintiff has asserted that Silberberg told Locicero about his alibi at the time of his arrest or soon after, no evidence supporting this contention has been presented. Silberberg did not testify in his affidavit, at his deposition, or at his criminal trial that he informed Locicero of his alibi at any time prior to September 1998. The only evidence in the record on this point is the affidavit of Locicero, which asserts that Silberberg informed the VSCU of his alibi only after he ceased cooperating in the investigation of Randy Redd.

When Locicero became aware of the alibi, contrary to the plaintiff's assertions, he did investigate it. Locicero contacted and interviewed Washington regarding the alibi. Locicero disclosed Silberberg's claim, and the results of his investigation, to the State's Attorney prior to trial. The State's Attorney made the decision to proceed with the prosecution in spite of this information.

Locicero and DeFelice still believe that it was Silberberg whom they saw in Gatison Park on August 1, 1996, and who sold the crack cocaine to DeFelice on that occasion. The plaintiff does not dispute this fact.

■ "Probable cause is the knowledge of facts sufficient to justify a reasonable person in the belief that there are

reasonable grounds for prosecuting an action." *Vandersluis v. Weil,* 176 Conn. 353, 407 A.2d 982, 985 (1978) (internal citations omitted). "Mere conjecture or suspicion is insufficient. Moreover, belief alone, no matter how sincere it may be, is not enough, since it must be based on circumstances which make it reasonable. Although want of probable cause is negative in character, the burden is upon the plaintiff to prove affirmatively, by circumstances or otherwise, that the defendant had no reasonable ground for instituting the criminal proceeding." *Zenik v. O'Brien,* 137 Conn. 592, 79 A.2d 769, 772 (1951) (internal citations omitted).

In *Bonide Products, Inc. v. Cahill,* 223 F.3d 141 (2d Cir.2000), a malicious prosecution case, the Second Circuit affirmed a ruling granting summary judgment in favor of the defendants on qualified immunity grounds. The plaintiff owned a pesticide manufacturing plant. The defendant, a conservation officer, investigated a fire at the plant. Upon arriving at the scene of the fire, the defendant was told that there was a "bad fire" at the plant, that the source of the fire was unknown, and that the fire department was considering evacuating the area due to smoke. The defendant observed water pouring out of the loading dock area of the plant during the fire. The defendant's later investigation of the fire concluded that the fire had been started by employees of the pesticide plant mixing chemicals near an open flame. The defendant further found that the plaintiff had been aware of the safety hazard of the open flame, and that there was standing water in the basement of the plant which was contaminated with acetone. The defendant brought the case to the attention of the District Attorney's office for prosecution, and the plaintiff was eventually charged with a recklessly engaging in conduct leading to the release of a hazardous substance, a misdemeanor. The charges were later dismissed because the court found no evidence of an actual discharge of any substance to the environment.

The court found that it was objectively reasonable for the defendant to conclude that the plant had released a hazardous substance. The defendant knew that some standing water in the plant was in fact contaminated with a hazardous substance, and he had seen water pouring out of the building during the fire. The defendant had also personally observed the fire, and although the plaintiff claimed that the plant had a containment system, and that the fire could not possibly have caused a release of any substance, the court found that it was reasonable for the defendant to assume that such a fire would likely have caused a release. The court therefore granted summary judgment in favor of the defendant on the claim of malicious prosecution.

Likewise, in *Lennon,* 66 F.3d at 424, the court found that the defendant police officers were entitled to qualified immunity on charges of false arrest and malicious prosecution. The plaintiff and her husband were having a dispute. The plaintiff's husband told the police that the plaintiff had taken his car without authorization. The husband showed the defendants a valid certificate of title and registration for the car, and the defendants approached the plaintiff and asked her to get out of the car. The plaintiff refused, locked herself in the car, started the engine, and called her attorney. The plaintiff wanted the officers to speak to her attorney regarding her asserted rights under the domestic relations law. However, the officers declined to speak to the attorney and arrested the plaintiff. The charges against the plaintiff were dismissed, and the plaintiff brought suit for false arrest and malicious prosecution.

The court found that the defendants were entitled to qualified immunity because they reasonably believed that the plaintiff had violated the law. When the plaintiff refused to get out of the car after being requested to do so, the officers reasonably believed that they had probable cause to arrest the plaintiff for interfering with their performance of their official duties.

The Second Circuit found in *Lee v. Sandberg*, 136 F.3d 94 (2d Cir.1997), that the district court erred in refusing to grant the defendants' motion for summary judgment on the grounds of qualified immunity in a malicious prosecution and false arrest case. The plaintiff was arrested for disorderly conduct after the defendant police officers were called to his home on two occasions in response to reports of a domestic disturbance. On both occasions, the plaintiff's wife reported that she had been physically abused by the plaintiff, once by him pushing her in the chest, and once by him hitting her arm, but on both occasions the wife stated that she suffered no pain or injuries.

The defendant police officers found the plaintiff's wife to be intoxicated and possibly mentally unstable on the first visit. At that time, the wife's eyes were red and glazed, and she appeared incoherent; the officers transported her to the hospital for psychiatric evaluation, after which she was released. The defendants were aware that the plaintiff's wife was under psychiatric care and taking prescription medication for her psychiatric problems. On the second visit, one of the officers found the plaintiff's wife to be coherent, while the other officer felt she was still unstable. On both occasions, the officers agreed that the plaintiff was calm and cooperative.

The court found that the officers were objectively reasonable in believing they had probable cause to arrest the plaintiff because his wife had signed a complaint reporting that the plaintiff had hit her arm. A psychiatrist stated after the first incident that the wife was able to relate facts accurately. Under state law, the officers were required to make an arrest if they found that a "family violence crime" had been committed. The court found that the officers were entitled to rely on the victim's complaint, and that under the circumstances it was objectively reasonable for them to believe they had probable cause to arrest the plaintiff. *See also Wachtler v. Cty. of Herkimer*, 35 F.3d 77 (2d Cir.1994) (affirming grant of summary judgment on qualified immunity grounds on malicious prosecution and false arrest claims); *Lowth v. Town of Cheektowaga*, 82 F.3d 563 (2d Cir.1996) (same); *Bradway v. Gonzales*, 26 F.3d 313 (2d Cir.1994) (same).

 It is undisputed that Locicero and DeFelice believed that Silberberg was the man they saw in Gatison Park on August 1, 1996, and that he was the man who sold crack cocaine to DeFelice. Based upon their prior knowledge of Silberberg, and the fact that the description of the man in the park fit that of Silberberg, it was reasonable for Locicero and DeFelice to conclude that they had identified Silberberg properly. "[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (internal quotation marks and citation omitted). Police officers making a probable cause determination "are also entitled to rely on the allegations of fellow police officers." *Id.* Here, DeFelice and Locicero were both eyewitnesses who saw the man they believed to be Silberberg in the park on August 1, 1996, and DeFelice was an eyewitness to the actual sale of crack cocaine by a man who matched the

description she had been given of Silberberg and who she later identified as Silberberg.

Although Locicero knew that Silberberg claimed to be innocent of the charges, a denial of guilt from an accused, without more, does not make it unreasonable for a police officer to pursue a criminal case. As to the alibi, the assertions of plaintiff's counsel that Locicero did not investigate Silberberg's alibi when he was made aware of it, in the absence of any evidence in support of those assertions, are not sufficient to create a genuine issue of material fact.

■■■ The fact that Silberberg was acquitted at his criminal trial does not, without more, mean that he was subjected to false arrest or malicious prosecution. "Perhaps a rational jury could find that the officers lacked probable cause and should not have arrested [the plaintiff]; however ... a rational jury could *not* find that the officers' judgment was so flawed that no reasonable officer would have made a similar choice." *Lennon,* 66 F.3d at 424–25. Accordingly, the court finds that Locicero and DeFelice are entitled to summary judgment, in their individual capacities, on the grounds of qualified immunity, as to the malicious prosecution and false arrest claims in Count One.

### D. *Count Two: Intentional Infliction of Emotional Distress*

■■■ Count Two sets forth a claim for intentional infliction of emotional distress. The Connecticut Supreme Court has stated the necessary elements of a claim for intentional infliction of emotional distress, as follows:

> In order for the plaintiff to prevail in a case for liability under intentional infliction of emotional distress, four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should

have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

*Appleton v. Bd. of Educ.,* 254 Conn. 205, 210, 757 A.2d 1059 (2000) (internal quotation marks and citations omitted). "Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Ancona v. Manafort Bros., Inc.,* 56 Conn.App. 701, 746 A.2d 184, 192 (2000).

■■■ The plaintiff acknowledges that this is the standard under Connecticut law for setting forth a claim of intentional infliction of emotional distress. See Pl.'s Memo. in Opp. at 18–19. Emotional distress is "severe", for these purposes, when "it reaches a level which no reasonable person could be expected to endure." *Almonte v. Coca–Cola Bottling Co. of N.Y., Inc.,* 959 F.Supp. 569, 575 (D.Conn.1997), *quoting Mellaly v. Eastman Kodak,* 42 Conn.Supp. 17, 597 A.2d 846, 848 (1991). However, the complaint does not allege that Silberberg actually sustained severe emotional distress. Further, although this deficiency was noted by the defendants, *see* Doc. # 59 at 25, the plaintiff's opposition to the motions for summary judgment refers to no evidence that the plaintiff suffered any emotional distress, severe or otherwise.

■■■ A review of Silberberg's deposition testimony also fails to provide any evidence in support of this claim. Silberberg testified that he had not received any medical treatment as a result of his arrest by the VSCU. *See* Silberberg Dep. at 91 (Doc. # 106, Ex. 2). When asked by his

attorney how the events underlying this lawsuit affected him, Silberberg spoke mainly of the consequences he *would* have suffered, had he been convicted. *Id.* at 131. Finally, Silberberg's attorney asked him the following question: "Psychologically, have you recovered from what you went through with the Valley Street Crime Unit?" *Id.* at 132–33. In response, Silberberg stated: "I thank God they didn't have their way. But what if they—you know, what if they would have won? I would have been gone. I wouldn't be here right now. It's still on my mind." *Id.* at 133.

These statements are the only evidence in the record regarding any emotional or psychological impact the events underlying this case had upon the plaintiff. The plaintiff has neither alleged nor produced evidence to show that he suffered "mental distress of a very serious kind." *Ancona,* 746 A.2d at 192. *See, e.g., Drew v. K-Mart Corp.,* 37 Conn.App. 239, 655 A.2d 806, 814 (1995) (testimony that plaintiff suffered "great humiliation" was insufficient to support a finding that the plaintiff suffered severe emotional distress); *Reed v. Signode Corp.,* 652 F.Supp. 129, 137 (D.Conn.1986) (plaintiff's testimony that events were "distressing" insufficient to support claim for intentional infliction of emotional distress); *Almonte,* 959 F.Supp. at 575 (granting summary judgment in favor of defendants on claim for intentional infliction of emotional distress where plaintiff alleged sleeplessness, depression, and anxiety, but did not offer any evidence that he suffered these symptoms "to an extraordinary degree"); *Esposito v. Conn. College,* 28 Conn.L.Rptr. 47, 2000 WL 1337665 (Conn.Super.2000) (granting summary judgment in favor of defendants on intentional infliction of emotional distress claim where "plaintiff's submissions fail[ed] to indicate any symptoms or conditions suffered by plaintiff"); *MacDonald v. Howard,* 28 Conn.L.Rptr. 373, 2000 WL 1687119 (Conn.Super.2000) (noting that

"merely alleging extreme emotional distress unsupported by factual allegations is legally insufficient" to sustain a claim for intentional infliction of emotional distress).

The plaintiff has failed to allege the required elements of a claim for intentional infliction of emotional distress, and the claim set forth in Count Two therefore fails as a matter of law. Each of the defendants is therefore entitled to summary judgment as to Count Two.

### E. *Count Three: Negligent Infliction of Emotional Distress*

■ The defendants argue that they are entitled to summary judgment on the claim of negligent infliction of emotional distress as well. The Connecticut Supreme Court recognized a cause of action for negligent infliction of emotional distress, where no physical injury ensues to the victim, in *Montinieri v. S. New England Tel.,* 175 Conn. 337, 398 A.2d 1180 (1978). In order to prevail on a claim for negligent infliction of emotional distress, a plaintiff must show that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it was caused, might result in illness or bodily harm." *Montinieri,* 398 A.2d at 1184.

The *Montinieri* test "requires that the fear or distress experienced by the plaintiff[ ] be reasonable in light of the conduct of the defendants." *Barrett v. Danbury Hosp.,* 232 Conn. 242, 654 A.2d 748, 757 (1995). *See, e.g., Ancona,* 746 A.2d at 192–93 (upholding trial court ruling in favor of defendant on claim for negligent infliction of emotional distress where "the plaintiff failed to show that the defendant should have anticipated that its [filing a lawsuit against the plaintiff] would cause the plaintiff any emotional distress beyond that normally associated with litigation").

Although a claim for negligent infliction of emotional distress does not require the plaintiff to demonstrate that he suffered severe emotional distress, as is necessary to sustain a claim for intentional infliction of emotional distress, it does require that the plaintiff show that he suffered *some* emotional distress. "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *Maffucci v. Royal Park Ltd. Ptnshp.*, 243 Conn. 552, 707 A.2d 15, 23 (1998) (quotation marks and citations omitted). Here, the plaintiff can not show that any defendant breached its duty to him, since no defendant engaged in conduct that involved an unreasonable risk of causing emotional distress to the plaintiff. The record shows that Locicero and DeFelice believed the plaintiff had committed serious criminal offenses and took steps to have him arrested and subsequently participated in the prosecution of the case against him. While such conduct may involve a risk of causing emotional distress to the person who is the subject of the criminal prosecution, that risk can not be characterized as unreasonable in light of the importance to our society of the prosecution of those who violate its criminal laws. Any claim against any other defendant would be based on the actions of Locicero and DeFelice. Therefore, each of the defendants is entitled to summary judgment on Count Three.

### F. *Count Four: Common Law Malicious Prosecution*

Summary judgment is being granted in favor of the defendants on Counts One, Two and Three. The only remaining claim, therefore, is Count Four, a common law claim for malicious prosecution asserted against the individual defendants, and, as discussed above, defendant Lynberg is entitled to summary judgment

on this claim. The Supreme Court has stated that

> in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine— judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.

*Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (internal citations and quotation marks omitted). *See also Lanza v. Merrill Lynch & Co.*, 154 F.3d 56, 61 (2d Cir.1998) (there are "notions of judicial economy and comity which militate against supplemental jurisdiction when the federal claims have been dismissed pre-trial."). An argument as to supplemental jurisdiction is the only argument addressing this count made by defendants Locicero and DeFelice. Therefore, the court declines to exercise jurisdiction over this claim, and Count Four is being dismissed, without prejudice.

### IV. *CONCLUSION*

For the reasons set forth above, the following motions are hereby GRANTED, as to Counts One, Two and Three: defendant Woodbridge's Motion for Summary Judgment [Doc. # 48]; defendant Shelton's Motion for Summary Judgment [Doc. # 58]; defendants Locicero and DeFelice's Motion for Summary Judgment [Doc. # 61]; defendant Seymour's Motions for Summary Judgment [Doc. # 67 and Doc. # 82]; defendant Monroe's Motion for Summary Judgment [Doc. # 73]; defendant Ansonia's Motion for Summary Judgment [Doc. # 85]; and defendant Derby's Motion for Summary Judgment [Doc. # 88]. Summary judgment shall also enter as to defendant Richard Lynberg on Count Four.

Count Four is hereby DISMISSED, without prejudice, as to defendants Locicero and DeFelice.

It is so ordered.